## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHARLES LEE**                                            **CIVIL ACTION**

**versus**                                                 **NO. 12-833**

**WARDEN HOWARD PRINCE**                      **SECTION: "F" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Charles Lee, is a state prisoner incarcerated at the Elayn Hunt Correctional Center, St. Gabriel, Louisiana.  On April 29, 2010, he was convicted of simple battery and

unauthorized entry of an inhabited dwelling under Louisiana law.[1]  On August 18, 2010, he was sentenced on the former conviction to a term of sixth months in parish jail.  On the same date, he was adjudicated a fourth felony offender and sentenced as such on the latter conviction to a term of twenty years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.[2]  On June 10, 2011, the Louisiana First Circuit Court of Appeal affirmed his convictions, affirmed his sentence on the simple battery conviction, affirmed his habitual offender adjudication, amended his sentence on the unauthorized entry conviction to remove the restriction on parole, and affirmed that sentence as amended.[3]  The Louisiana Supreme Court then denied his related writ application on December 16, 2011.[4]

Petitioner thereafter filed the instant federal application for *habeas corpus* relief.[5] The state concedes that the application is timely and that petitioner exhausted his remedies in the state courts.[6]

---

[1] State Rec., Vol. II of V, transcript of April 29, 2010, at p. 233; State Rec., Vol. I of V, minute entry dated April 29, 2010; State Rec., Vol. I of IV, jury verdict forms.

[2] State Rec., Vol. II of V, transcript of August 18, 2010; State Rec., Vol. I of V, minute entry dated August 18, 2010; State Rec., Vol. I of V, Reasons for Judgment dated August 25, 2010.

[3] State v. Lee, No. 2010 KA 2164, 2011 WL 3427144 (La. App. 1st Cir. June 10, 2011); State Rec., Vol. III of V.

[4] State v. Lee, 76 So.3d 1201 (La. 2011) (No. 2011-K-1440); State Rec., Vol. III of V.

[5] Rec. Doc. 1.

[6] Rec. Doc. 7, pp. 2-3.

I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  <u>Bell</u>, 535

U.S. at 694.

      Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals

has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases.  A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme
> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets,

and footnotes omitted).

      Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways.  First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Court's cases but unreasonably applies it to the
> facts of the particular state prisoner's case.  Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

<u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an

incorrect one."   Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."),

cert. denied, 132 S.Ct. 1537 (2012).

        While the AEDPA standards of review are strict and narrow, they are purposely so.

As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's
> contrary conclusion was unreasonable.
>
>         If this standard is difficult to meet, that is because it was
> meant to be.  As amended by AEDPA, § 2254(d) stops short of
> imposing a complete bar on federal court relitigation of claims
> already rejected in state proceedings.  It preserves authority to issue
> the writ in cases where there is *no possibility* fairminded jurists could
> disagree that the state court's decision conflicts with this Court's
> precedents.  It goes no farther.  Section 2254(d) reflects the view that
> habeas corpus is a guard against *extreme malfunctions* in the state
> criminal justice systems, *not a substitute for ordinary error*
> *correction through appeal.  As a condition for obtaining habeas*
> *corpus from a federal court, a state prisoner must show that the state*
> *court's ruling on the claim being presented in federal court was so*
> *lacking in justification that there was an error well understood and*
> *comprehended in existing law beyond any possibility for fairminded*
> *disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts

of this case as follows:

> Marlon Parker testified at trial.  He had fathered a child with the defendant's sister, and referred to the defendant as his brother or brother-in-law.  Parker was the boyfriend of Bonshelle Thomas and visited her at the home of the defendant's mother, on South Harrison Road in St. Tammany Parish (the home), where Thomas lived with her four children.  Parker referred to the defendant's mother, Clara Lee, as his mother-in-law, and indicated she had given Thomas the right to live in the home.  Parker had previously lived in the home with the defendant's sister, and the defendant's family treated him as though he was "their own son."  Parker indicated he paid the bills for "the lights and everything" at the home, although the bills were not in his name.  He conceded the bill for the satellite dish at the home was in the name of the defendant.  Parker answered affirmatively when asked if the defendant had grown up in the home and if he had permission to go there.  However, he indicated that neither he nor Thomas gave the defendant permission to enter the home on the night in question.
>
> At the time of the incident, the defendant lived with his sister, at 57400 John Smith Road, across the street from the home on South Harrison Road.
>
> On July 12, 2009, at approximately 9:00 p.m., the defendant asked Parker for permission to use Thomas's car.  Parker refused because he had to pay to get another car back after the defendant had driven it without a license and it had been towed away.  Parker was also aware that the defendant had been drinking.  The defendant took the car anyway and, after waiting approximately forty-five minutes to one hour, Parker called the police to find out where the defendant had taken the car.  The police arrived at the same time as the defendant returned with the car.  Parker told the police he did not want to press charges against the defendant, but the defendant was furious that Parker had called the police and told Parker and Thomas that "it wasn't over."
>
> Approximately fifteen minutes later, after the police had left the scene, the defendant, carrying a large stick, banged on the front door of the home, shouting, "[o]pen up the door."  When no one let him in, he kicked in the door, shattering everything next to the door,

and causing the children in the home to scream.  He tried to strike Parker with the stick, but it hit the ceiling and broke into two pieces. Parker was able to take the part of the stick the defendant was holding away from him, but it cut him on the arm.  Parker held onto the defendant and tried to calm him down.  The defendant's cousin arrived at the home and also tried to calm the defendant down. Thereafter, the defendant left the home with his cousin.

Bonshelle Thomas also testified at trial.  Thomas remembered that Parker was upset because the defendant had taken the car. Parker called the police and they and the defendant arrived at the home at the same time.  The defendant was upset that Parker had called the police.  Parker told the police that he did not want to press charges and they left.  Thereafter, the defendant returned to the home, and knocked on the door, demanding that Parker come out.  Parker refused to go outside, and locked the door to prevent the defendant from entering.  The defendant kicked the door in and came at Parker with a stick, but Parker was able to disarm him after a struggle.

Thomas indicated that Parker paid the rent for the home and "utilities and all." She conceded the bill for the satellite dish at the home was in the name of the defendant, but indicated the defendant had given Parker permission to put the bill in the defendant's name. When asked if the defendant would always have permission to be at his mother's home, Thomas replied, "Yes. I would imagine."  She indicated, however, the defendant did not have permission to break into the home, and she did not give the defendant permission to enter the home on the night in question.[7]

### III.  Petitioner's Claims

### A. Batson Claims

Petitioner claims that the trial court erred in not finding purposeful discrimination in the prosecutor's use of peremptory challenges to exclude jurors on the basis of race.  On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

In assignments of error numbers 1 and 2, the defendant argues the trial court erred in overruling his objections under Batson v.

---

[7] Lee, 2011 WL 3427144, at *1-2; State Rec., Vol. III of V.

Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the State's use of peremptory challenges against prospective jurors: Osi, Jones, and Mercadel.

Under Batson, an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race.  See also LSA-C.Cr.P. art. 795(C)-(E). If the defendant makes a prima facie showing of discriminatory strikes, the burden shifts to the State to offer racially-neutral explanations for the challenged members.   The race-neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar.  If the race-neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether the defendant has proven purposeful discrimination.  State v. Elie, 05-1569, p. 5 (La. 7/10/06), 936 So.2d 791, 795.  A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous.  Elie, 05-1569 at p. 5, 936 So.2d at 795.

The Batson explanation does not need to be persuasive, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral.  The ultimate burden of persuasion remains on the party raising the challenge to prove purposeful discrimination.  Elie, 05-1569 at p. 5, 936 So.2d at 795-96.

In order to satisfy Batson's first step, a moving party need only produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.  Elie, 05-1569 at p. 6, 936 So.2d at 796.   Batson's admonition to consider all relevant circumstances in addressing the question of discriminatory intent requires close scrutiny of the challenged strikes when compared with the treatment of panel members who expressed similar views or shared similar circumstances in their backgrounds.  The one relevant circumstance for a trial judge to consider is whether the State articulated "verifiable and legitimate" explanations for striking minority jurors.  Id.

The six-person jury and one alternate juror in this case were selected from one panel of prospective jurors.  During voir dire, the State exercised four peremptory challenges in selecting the jury, resulting in the exclusion of three black prospective jurors (Osi, Jones, and Mercadel) and one white prospective juror (Ford).  The State also used a fifth peremptory challenge to exclude another white juror as the alternate (Brundrett).  Ultimately, the six jurors selected

to serve on the jury were Kraus, Crain, Miller, Grossnickle, Lemoine, and Oswald.

The defense objected to the State's peremptory challenges against the black jurors under Batson.  The trial court entertained the State's race-neutral reasons for the exclusions without making a finding of whether defendant had made a prima facie showing of purposeful racial discrimination.  In this situation, the issue of whether the defense established a prima facie case of discrimination is moot.  See State v. Green, 94-0887, p. 25 (La. 5/22/95), 655 So.2d 272, 288 (applying Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) and concluding that once the trial court has demanded race-neutral reasons for the prosecutor's peremptory strikes, the issue of a prima facie case of discrimination becomes moot).  Therefore, the analysis begins with Batson's second step in which any response will qualify as race-neutral "unless a discriminatory intent is inherent in the prosecutor's explanation." Hernandez, 500 U.S. at 352, 111 S.Ct. 1859.

In regard to Osi and Jones, the State indicated it had challenged the jurors because, in response to a question asked by the defense, they had indicated they would rather free a guilty person than convict an innocent one.   The defendant argues the disingenuousness of the prosecutor's statement was readily apparent because he accepted white jurors, Faciane, Brundrett, Stafford, Coates, Skrmetta, Grossnickle, and Oswald, who had given similar answers to Osi and Jones.[FN2]

> [FN2]  The first prospective juror questioned, Reese, indicated he would rather convict an innocent man than free a guilty man because "[h]e can have an appeal.  The next victim never has an appeal." Kraus stated he could not "pick one way or the other." Crain, Miller, and Lemoine all indicated they would rather convict an innocent man than free a guilty man.

However, the record reflects that the State challenged Faciane for cause, and said juror was dismissed without objection from the defense.  With regard to Brundrett, the State did not accept this juror and used a peremptory challenge to exclude her when she was proposed as an alternate.  Skremetta was challenged by the defendant and not selected to serve on the jury.  With respect to Stafford and Coates, the State neither accepted nor rejected these jurors because

the court had already seated a jury prior to the asking either the State or the defense if these jurors were acceptable.

Additionally, when the defendant raised the <u>Batson</u> challenge, the State pointed out that it also challenged Ford, a prospective white juror, for the same reason that she agreed that it would be better to allow a guilty man to go free rather than convict an innocent one. In response, the defense noted that the State had failed to challenge Grossnickle for holding that same belief. [FN3]  The State replied it had not noted that Grossnickle had replied in that manner.[FN4]  The court found the State had articulated a race-neutral reason for the challenges and overruled the defense objections to the challenges against Osi and Jones.

> [FN3]  The defense made no reference to Oswald's response when it raised the <u>Batson</u> challenge.

> [FN4]  The State concedes that the transcript discloses that the prosecutor's notes were in error.

After the trial court overruled the above-referenced <u>Batson</u> challenge, the defense "put on the record" that "all the black jurors in the panel were cut by the State."  Subsequently, in regard to Mercadel (the other excluded black juror), the State indicated it had challenged her because her uncle, who had been convicted of rape before she was born, was serving a life sentence.[FN5]  After considering the explanation, the court denied the objection to the challenge against Mercadel.  At that time, defendant failed to point out that other similarly situated jurors had not been challenged by the State.

> [FN5]  We also note that Mercadel indicated that she would rather free a guilty person than convict an innocent one.

On appeal, the defendant now makes the argument that other jurors who had "substantial connections to criminal activity" were not excused.    The defendant contends that the prosecutor's explanation that it was bumping Mercadel because of her uncle's incarceration "reeks of afterthought."  However, since the defendant did not make this challenge during voir dire, we cannot conclude that trial court erred in not considering this circumstance.

The trial court plays a unique role in the dynamics of a voir dire, for it is the court that observes firsthand the demeanor of the attorneys and venirepersons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. State v. Myers, 99-1803, p. 6 (La. 4/11/00), 761 So.2d 498, 502.

Further, the fact that a prosecutor excuses one person with a particular characteristic and not another similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination. The accepted juror may have exhibited other traits which the prosecutor could have reasonably believed would make him desirable as a juror. State v. Collier, 553 So.2d 815, 822 (La. 1989) [citing People v. Young, 128 Ill.2d 1, 131 Ill. Dec. 78, 538 N.E.2d 453 (1989)].

Considering the foregoing, we cannot conclude that the trial court's finding that the State did not have discriminatory intent in exercising peremptory challenges against Osi, Jones, and Mercadel was clearly erroneous.

These assignments of error are without merit.[8]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[9]

Obviously, the state courts correctly identified the controlling clearly established federal law, i.e. Batson and its progeny. The state courts were also correct in finding that first step of the Batson analysis was moot because the prosecutor voluntarily offered his reasons for the challenged strikes. See, e.g., Ladd v. Cockrell, 311 F.3d 349, 355 (5th Cir. 2002) ("Where, as here, the State tendered a race-neutral explanation, the question of the defendant's prima facie case is moot, and our review begins at step two." (quotation marks and brackets omitted)). Therefore, this Court is concerned only with the application of the second and third steps of the Batson analysis.

---

[8] Lee, 2011 WL 3427144, at *4-6; State Rec., Vol. III of V.

[9] State v. Lee, 76 So.3d 1201 (La. 2011) (No. 2011-K-1440); State Rec., Vol. III of V.

Turning first to the peremptory challenges of Jones and Osi, the state courts were correct in finding that the prosecutor met his burden at the second step of the <u>Batson</u> analysis.  As noted, the prosecutor stated that his reason for striking Jones and Osi was that they opined that they had rather free a guilty man than convict an innocent one.  The prosecutor's purported reluctance to allow such a juror to serve, while arguably odious, was unquestionably race-neutral and therefore sufficient to meet the prosecutor's burden at the second step.

At the third step of the <u>Batson</u> analysis, defense counsel countered by noting that "the State has allowed other jurors to give that same answer."[10]  That clearly is a valid basis for a <u>Batson</u> challenge.  As the United States Supreme Court explained in <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241 (2005), "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson</u>'s third step."  In light of <u>Miller-El</u>, the United States Fifth Circuit Court of Appeals has explained:

> The [United States Supreme] Court's treatment of Miller-El's comparative analysis also reveals several principles to guide us.  First, we do not need to compare jurors that exhibit *all* of the exact same characteristics.  If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects.  Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination.  Third, we must

---

[10] State Rec., Vol. I of V, transcript of April 29, 2010, at p. 126.

> consider only the State's asserted reasons for striking the black jurors
> and compare those reasons with its treatment of the nonblack jurors.

Reed v. Quarterman, 555 F.3d 364, 376 (5th Cir. 2009)  (citations omitted).

In the instant case, the only reason the prosecutor gave for striking Jones and Osi was their statement that they had rather free a guilty man than convict an innocent one.[11]  However, ten other prospective jurors made that same statement:  Skrmetta,[12] Grossnickle,[13] Stafford,[14] Dwyer,[15] Brundrett,[16] Oswald,[17] Mercadel,[18] Ford,[19] Faciane,[20] and Coates.[21]  Of those individuals, Ford and Brundrett, who apparently were not African Americans, were also struck by the prosecutor.[22]  As to Grossnickle, the prosecutor allegedly was under the mistaken impression that she did not express

---

[11] Id. at p. 125.

[12] Id. at pp. 115-16.

[13] Id. at p. 116.

[14] Id. at p. 118.

[15] Id.

[16] Id. at pp. 118-19.

[17] Id. at p. 119.

[18] Id.

[19] Id.

[20] Id.

[21] Id. at pp. 119-20.

[22] Id. at pp. 123 and 126-27.

that opinion.[23]  Further, it unknown whether the prosecutor would have exercised a peremptory challenge as to several of the remaining individuals on this same proffered basis due to the circumstances:  Skrmetta was struck by the defense;[24] Mercadel was struck by the prosecutor but purportedly for a different reason;[25] Faciane was excused for cause on other grounds;[26] and the jury had been picked before the prosecutor had to decide on either Stafford and Coates.  That, however, still leaves Oswald and Dwyer.  Neither of those individuals was an African American[27] and, as noted, both voiced precisely the same opinion for which Osi and Jones were allegedly struck.

Dwyer, who was selected to serve as an alternate, does not present a problem.  The parties were allowed only one peremptory challenge in the choosing of the alternate,[28] and the

---

[23] Id. at p. 126.

[24] Id. at p. 121.

[25] Id. at pp. 123 and 127.

[26] Id. at p. 121.

[27] See id. at p. 127 (Ierardi's unchallenged observation that "all the black jurors in the panel were cut by the State").

[28] Louisiana law provides:

> If the court determines that alternate jurors are desirable in the case, the court shall determine the number to be chosen. The regular peremptory challenges allowed by law shall not be used against the alternate jurors. The court shall determine how many additional peremptory challenges shall be allowed, and each defendant shall have an equal number of such challenges. The state shall have as many peremptory challenges as the defense. The additional peremptory challenges may be used only against alternate jurors.

La. Code Crim. P. art. 789(A).  In the instant case, the trial court allowed each side one such peremptory challenge.  State Rec., Vol. I of V, minute entry dated April 29, 2010; see also State Rec., Vol. I of V, transcript of April 29, 2010, at p. 124.

prosecutor had already used his single challenge before Dwyer's selection.[29]   Therefore, the prosecutor had no opportunity to use a peremptory challenge to strike Dwyer, and so it cannot be known if he would have done so.

Oswald, however, is problematic.[30]   Again, the *sole* reason proffered by the prosecutor for striking Osi and Jones was that they expressed the opinion that they had rather free a guilty man than convict an innocent one.  If the prosecutor in fact did not want individuals of that opinion serving on the jury, then no explanation can be gleaned from the record as to why Oswald, a Caucasian who also held that opinion, went unchallenged when the prosecutor still had peremptory challenges available.[31]

As an initial matter, the Court notes that the "comparative analysis" here could not be easier, in that there is no need to struggle with whether the prospective jurors at issue were in fact "similar."  Regarding the trait at issue, i.e. the belief that it is better to free a guilty man than to

---

[29] State Rec., Vol. I of V, transcript of April 29, 2010, at pp. 126-27.

[30] With respect to Oswald, this Court must make an additional observation.  In its opinion, the Louisiana First Circuit Court of Appeal noted that "the defense made no reference to Oswald's response when it raised the Batson challenge."  Lee, 2011 WL 3427144, at *5 n.3; State Rec., Vol. III of V.  It is unclear whether that comment was meant as merely a passing observation or whether it was intended as a criticism of defense counsel's failure to make a specific argument.  Even if it was the latter and even if the state court meant it as a justification for its failure to compare Osi and Jones to Oswald, it is of no import here.  Under federal law, a federal *habeas* court is to review the *entire* voir dire transcript and engage in comparative analysis even if the defense made no comparative analysis argument at trial and the state courts refused to conduct such an analysis.  Reed v. Quarterman, 555 F.3d 364, 369-75 (5th Cir. 2009).  Therefore, this Court must review the voir dire as a whole, including the questioning of Oswald, even if the state courts failed to do so.

[31] Under La. Code Crim. P. art. 799, the prosecutor was allowed *six* peremptory challenges with respect to the regular jury panel; he used only *four*.

convict an innocent one, Oswald, Osi, and Jones were not only "similar," they were essentially identical.  All three clearly and unambiguously stated that they held that held that same belief.

However, the crucial question here is whether a "comparative analysis" showing such a disparity is in and of itself determinative on *habeas* review.  The answer appears to be no.  As noted, in Miller-El, the case in which the United States Supreme Court embraced the use of comparative analysis, the Court explained, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence *tending to prove* purposeful discrimination to be considered at Batson's third step."  Miller-El, 545 U.S. at 241 (emphasis added).  The Supreme Court did not hold in Miller-El that such evidence of seemingly disparate treatment in a single instance was *conclusive proof* of purposeful discrimination.  Rather, that was only one component of the evidence considered in Miller-El, where there was in fact *abundant* evidence of racial animus:  the prosecutor questioned African American jurors in a particularly graphic manner obviously intended to elicit a disfavored opinion, while other jurors were not questioned in that manner; the prosecutor engaged in "jury shuffling," a practice which could be used to decrease the likelihood that African Americans would be selected for the jury; and there was evidence in the record indicating that there was historically a systemic policy to exclude African Americans in the jurisdiction.  It was that evidence considered as a whole, not the comparative analysis disparities viewed in isolation, which led the Supreme Court to hold that, even under the deferential standards of the AEDPA, petitioner had established a Batson violation.  Miller-El, 545 U.S. at 265-66.

By contrast, aside from the prosecutor's failure to strike Oswald, there is little, if any, other evidence that here the prosecutor was motivated by a discriminatory intent.  For example, a statistical analysis alone is not particularly helpful, in that only three of the twenty-four individuals on the panel were African Americans.  With such a low number involved, the fact that all African Americans were removed could easily have resulted from happenstance rather than from purposeful discrimination.

Further, although Osi and Jones were struck by the prosecutor based on the stated opinion, the prosecutor also struck a Caucasian juror (Ford) for the same reason.  Moreover, while two jurors who held that same opinion ultimately sat on the jury, the prosecutor was allegedly unaware that one of those individuals (Grossnickle) held the opinion and the remaining individual (Oswald) could simply have been inadvertently overlooked.

Additionally, while the prosecutor also struck the one remaining African American, Mercadel, that strike is not inherently suspect. Although Mercadel also held the same disfavored opinion that it is better to free the guilty,[32] the prosecutor explained that he did not want her on the jury for an additional reason, i.e. her uncle was  currently in prison serving a life sentence.[33]  A strike on that basis is obviously race-neutral and not otherwise suspect, in that it is widely recognized that "[j]urors with relatives in prison may sympathize with a defendant, or have feelings of animosity against the prosecution. "  United States v. Hendrix, 509 F.3d 362, 370 (7th Cir. 2007).  Moreover, although petitioner argues that a comparative analysis shows that the reason was in fact pretextual

---

[32] State Rec., Vol. I of V, transcript of April 29, 2010, at p. 119.

[33] Id. at pp. 102 and 127.

with respect to Mercadel, that contention has no merit because there were no other truly similar individuals on the panel.  Although Oswald stated that he "believe[d]" his son had been convicted for possession of an unspecified drug,[34] there is no indication that the son was currently (or indeed ever had been) imprisoned for that crime.  Further, while prospective juror Hatheway's father and uncle had formerly been imprisoned for drug trafficking,[35] the jury was already selected before the prosecutor was required to decide whether to strike her.  Lastly, although petitioner argues that Lemoine was similar, he was not.  Lemoine stated that he had been charged with a crime many years ago but that the charge was *nolle prossed*.[36]  Therefore, the Court finds that the strike of Mercadel is not evidence that the prosecutor was motivated by a discriminatory intent.

In summary, there is little more in the instant case than a suspicious, unexplained failure to strike a single Caucasian juror, Oswald, who expressed the same opinion given as the reason for striking two African American individuals, Osi and Jones.  While that failure to strike Oswald may appear suspicious, that alone simply is not a sufficient basis on which to grant *habeas* relief under the deferential standards of the AEDPA.  Even when circumstances give a federal court "reason to question the prosecutor's credibility ... [t]hat does not ... compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications and conclude [the petitioner] ha[s] shown a Batson violation.  Reasonable minds reviewing the record

---

[34] Id. at p. 103.

[35] Id. at p. 104.

[36] Id. at pp. 101-02.

might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." Rice v. Collins, 546 U.S. 333, 341-42 (2006).

For all of these reasons, this Court finds that Miller-El, in which there was abundant evidence of discriminatory intent *in addition to* the comparative analysis, simply does not compel a finding that Batson was violated in this factually distinguishable case. Accordingly, under the AEDPA's stringently deferential standards, which require that state-court decisions be given the benefit of the doubt, this Court should defer to the state court decision rejecting petitioner's claim that the striking of Osi and Jones violated Batson.[37]

To the extent that petitioner is separately contending that the strike of Mercadel violated Batson, that contention likewise has no merit. As previously noted, the prosecutor's proffered reason for striking Mercadel, i.e. her uncle was currently in prison serving a life sentence, was race-neutral. As also previously noted, the strike was not suspect based on a comparative analysis because no other jurors were truly similar to Mercadel. And, lastly, in any event, there was

---

[37] Out of an abundance of caution, this Court further notes that such a finding also is not compelled by Snyder v. Louisiana, 552 U.S. 472 (2008), a subsequent case in which the Supreme Court gave great weight to a comparative analysis. Snyder is distinguishable on least two grounds. First, again, the Supreme Court did not rely solely on the comparative analysis; for example, the Supreme Court took pains to note that the prosecutor's stated reason for his strike appeared pretextual when evaluated in light of the facts. Id. at 482. Second, and more importantly, Snyder arose in the context of *direct* review. Therefore, the Supreme Court needed only to find that the state court's ruling was "clearly erroneous" in order to grant relief. Id. at 477. While that is an onerous standard, it is not nearly as onerous the highly deferential standard which must be applied under the AEDPA. As previously explained in this opinion, for *habeas* relief to be warranted, the state court's decision must have been *unreasonable*, not merely erroneous. See Rice v. Collins, 546 U.S. 333, 338-39 (2006); see also Felkner v. Jackson, 131 S.Ct. 1305, 1307 (2011) (noting that Snyder's "clearly erroneous" standard applies on direct review, whereas "[o]n federal habeas review, AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt" (internal quotation marks omitted)).

little, if any, evidence showing that any of the prosecutor's strikes were perhaps racially motivated. Again, unlike in <u>Miller-El</u>, where there was evidence of a systemic policy to discriminate, disparate questioning based on race, and other suspect practices used to manipulate the jury selection process, no such other evidence of racial motivation is evident from the instant record.

   Lastly, the Court notes that petitioner also argues that the trial court "erred by failing to create a proper record of the races of the jurors."[38]  However, on direct appeal, the Louisiana First Circuit Court of Appeal held:

> In assignment of error number 3, the defendant submits the issues raised in assignments of error numbers 1 and 2 [the <u>Batson</u> claims] can be adequately addressed on the basis of the comments of trial counsel and the trial court during voir dire, but argues if this court rejects the <u>Batson</u> claim because the record fails to include the race of every prospective juror, then the trial court should be held responsible for that failure rather than the defendant. Our resolution of assignments of error numbers 1 and 2 causes us to pretermit consideration of this assignment of error.[39]

This Court likewise need not consider this contention because it also finds that the record is sufficient to consider the <u>Batson</u> claims on the merits.

## B.  Sufficiency of the Evidence

   Petitioner next argues that the trial court erred in denying his motions for post verdict judgment of acquittal and new trial on the grounds that there was insufficient evidence to support his conviction for the unauthorized entry of an inhabited dwelling.  On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

---

[38] Rec. Doc. 1-1, p. 6.

[39] <u>Lee</u>, 2011 WL 3427144, at *6.

In assignment of error number 4, the defendant argues there was insufficient evidence that his entry into his childhood home was unauthorized.  In assignment of error number 5, he argues the trial court erred by denying the motion for post-verdict judgment of acquittal due to the alleged insufficient evidence.  In assignment of error number 6, he argues the trial court erred in denying the motion for new trial due to the alleged insufficient evidence.  He combines the assignments of error for argument.  He does not challenge his conviction on [the simple battery charge].

The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt.  In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," in order to convict, every reasonable hypothesis of innocence is excluded.  State v. Wright, 98-0601, p. 2 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157, 2000–0895 (La. 11/17/00), 773 So.2d 732 (quoting LSA-R.S. 15:438).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution.  When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.  Wright, 98-0601 at p. 3, 730 So.2d at 487.

Unauthorized entry of an inhabited dwelling is the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person.  LSA-R.S. 14:62.3(A).  The relevant question is not whether the defendant could generally enter the victim's residence, but whether this particular entry was authorized.  State v. Spain, 99-1956, p. 7 (La.App. 4 Cir. 3/15/00), 757 So.2d 879, 884.

After a thorough review of the record, we are convinced that any rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the evidence

proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of unauthorized entry of an inhabited dwelling, and the defendant's identity as the perpetrator of that offense.  The jury rejected the defendant's theory that he was authorized to enter the home on the night in question.  When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt.  State v. Moten, 510 So.2d 55, 61 (La.App. 1 Cir.), writ denied, 514 So.2d 126 (La. 1987).  No such hypothesis exists in the instant case.  The verdict rendered against the defendant indicates the jury accepted the testimony offered against him, including the testimony that his entry into the home by kicking in the door was not authorized, and rejected his attempts to discredit that testimony.  As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness.  Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.  State v. Johnson, 99-0385, pp. 9-10 (La.App. 1 Cir. 11/5/99), 745 So.2d 217, 223, writ denied, 00-0829 (La. 11/13/00), 774 So.2d 971.  On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt.  State v. Glynn, 94-0332, p. 32 (La.App. 1 Cir. 4/7/95), 653 So.2d 1288, 1310, writ denied, 95-1153 (La. 10/6/95), 661 So.2d 464.  Moreover, in reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them.  See State v. Ordodi, 06-0207, p. 14 (La. 11/29/06), 946 So.2d 654, 662.  An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury.  State v. Calloway, 07-2306, pp. 1-2 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

These assignments of error are without merit.[40]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[41]

---

[40] Lee, 2011 WL 3427144, at *2-4; State Rec., Vol. III of V.

[41] State v. Lee, 76 So.3d 1201 (La. 2011) (No. 2011-K-1440); State Rec., Vol. III of V.

Because sufficiency of the evidence claims present a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that he has made no such showing.

As correctly noted by the state court, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 132 S.Ct. 2, 4 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."). Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."

- 23 -

Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S.Ct. 2060, 2062 (2012).[42]

        Here, petitioner's dispute is not truly with what facts were or were not established by the evidence admitted at trial. Rather, he is arguing that the state criminal statute of which he stands convicted was *misinterpreted* by the state courts. Specifically, he is opining that, as a matter of state law, his entry into the house could not violate La. Rev. Stat. Ann. § 14:62.3 because he was generally allowed to enter the residence by the residence's owner. That, however, simply is not for this Court to say. In the instant case, petitioner argued to the state courts that the statute should not be interpreted to encompass such a situation, but the state courts, including the Louisiana Supreme Court, rejected that argument. This Court may not second-guess that ruling as to the proper interpretation of state law. "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005); see Noel v. Prince, Civ. Action No. 09-7730, 2010 WL

---

   [42] Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011), cert. denied, 132 S.Ct. 1713 (2012); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S.Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

4364689, at *4-5 (E.D. La. Aug. 27, 2010), adopted, 2010 WL 4362453 (E.D. La. Oct. 21, 2010); see also Charles v. Thaler, 629 F.3d 494, 500-01 (5th Cir. 2011) ("Under § 2254, federal habeas courts sit to review state court misapplications of federal law. A federal court lacks authority to rule that a state court incorrectly interpreted its own law. When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law."); Lyons v. Bingham, Civ. Action No. 4:08CV57, 2011 WL 4566109, at *3-4 (S.D. Miss. Sept. 29, 2011).

For all of these reasons, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the deferential standards of review which must be applied by this federal *habeas* court, relief is not warranted.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition of **Charles Lee** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

- 25 -

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[43]

New Orleans, Louisiana, this eighteenth day of July, 2013.


DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[43] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.